UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **ARGONAUT INSURANCE COMPANY,**<br><br>          Plaintiff/Counter-Defendant,<br><br>     vs.<br><br>**CITY OF WARREN, ANWAR KHAN, SHAWN JOHNSON, and LAWRENCE GARNER,**<br><br>          Defendants/Counter-Plaintiffs. | 2:19-CV-13769-TGB-RSW<br>HON. TERRENCE G. BERG<br><br><br><br>**ORDER DENYING ARGONAUT INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 16)** |

In 2017, DeSheila Howlett sued the City of Warren and several of its employees. Howlett, Warren's first African American police officer, charged that the Warren police department and some of her co-workers had discriminated against her on the basis of her race and gender. Argonaut Insurance Company, which issued several policies to the City, now seeks a judicial declaration that it need not defend the City in Howlett's suit nor indemnify the City for any potential settlement or award. Argonaut maintains that the policies it issued to the city do not cover Howlett's allegations because those events should be deemed to predate the first policy's coverage term. Argonaut has filed a Motion for Summary Judgment on all its claims. (ECF No. 16). For the reasons below, that Motion will be **DENIED**.

1

# I.   BACKGROUND

DeSheila Howlett was hired as the City of Warren's first African American police officer in 2006. A decade later, Howlett sued the City, alleging that she had been driven from her job by pervasive racial and sexual harassment. On September 16, 2019, this Court resolved cross motions for summary judgment in the underlying lawsuit in a written order. *See generally Howlett v. City of Warren*, 2019 WL 4450984, at *1 (E.D. Mich. Sept. 16, 2019).  The facts of the underlying suit, recounted in detail in that order, will not be repeated at great length here.

### a. Howlett's allegations in the underlying lawsuit

In brief, Howlett alleges that she was discriminated against and harassed on the basis of her sex and race from nearly the moment she was hired until she resigned. She says that during her initial training, officers made comments about her sex and race, and intentionally and arbitrarily issued her a failing training score. She alleges that dispatchers sandbagged her by routinely failing to provide her with backup during police calls and, on at least one occasion, refusing to provide her with the physical description of a suspect on the run. She says that City refused to assign her to light-duty work while she recovered from a 2011 off-duty injury, despite making similar accommodations for other injured officers. All of this, Howlett contends, was because of her race and sex.

Howlett also alleges that she was subject to myriad sexual and racial abuse: racial epithets, unwanted repeated sexual advances, physical touching, and many other harassing comments, particularly from Officer Shawn Johnson.

Howlett also sued several police officers individually. Those officers are also Defendants in this suit.[1] Howlett alleges that Defendant Kahn made disparaging comments about women and issued her a failing training grade without justification shortly after she was hired in 2006. She also says that, in 2016, Kahn pulled her over while she was driving to a crime scene and falsely accused her of driving recklessly. Howlett accuses Defendant Johnson of making repeated sexually and racially harassing comments beginning sometime in 2015. Howlett accuses Defendant Garner of failing to separate Howlett from Johnson despite awareness of Johnson's conduct.

In the underlying lawsuit, this Court granted summary judgment in favor of the defendants on Howlett's Fourteenth Amendment due process claim, conspiracy claim, and interference-with-contract claim. The Court denied summary judgment on Howlett's Title VII claim based on race and gender discrimination and Howlett's *Monell* claim. The Court granted in part the defendants' motion as to Howlett's Fourteenth

---

[1] Howlett sued several other police department employees in the underlying suit, but her claims against those defendants have been dismissed by stipulation or by the Court's order.

Amendment equal protection claim, dismissing her claim to the extent it was based on any events occurring before April 21, 2014. Finally, the Court also denied Howlett's motion for summary judgment, which sought judgment in Howlett's favor on her *Monell* claim.

Accordingly, the following claims remain active in the underlying suit: Howlett's Title VII claim against the City, Kahn, Johnson and Garner; Howlett's Fourteenth Amendment equal protection claim against Kahn, Johnson, and Garner for all claims based on events after April 21, 2014; and Howlett's *Monell* claim against the City.

In this follow-on suit, Plaintiff Argonaut seeks a judicial declaration that it is not obligated to defend the City or its employees in Howlett's lawsuit, nor indemnify the City if Howlett's suit is successful or if the case settles.

### b. Argonaut's insurance policies

Argonaut issued five Employment Practices Liability policies to the City,[2] each with a one-year policy period. The first began on July 1, 2012, and the last ended on July 1, 2017. *See* Pl's. Mot., ECF No. 16, PageID.273.[3] The policy defines as its "insured" the City of Warren and

---

[2] The Court will refer to the defendants collectively as "the City" unless a distinction between the defendants is material.

[3] Neither party disputes that the relevant provisions in each policy include the same or substantially identical language from year to year. Accordingly, the Court will generally refer to the policies collectively in the singular in this order.

any of the City's current or former employees when engaged in activities within the scope of their employment. Insurance Policies, ECF No. 16-2, PageID.311. The policy offers coverage for "employment practices wrongful acts" so long as a few requirements are met.[4]

Under the policy, an "'employment practices wrongful act' includes any loss or injury . . . arising out of any one or more" of a number of enumerated offenses:

(1) Employment-related practices, policies, procedures, acts, errors or omissions, including but not limited to, coercion, demotion, evaluation, reassignment, malicious prosecution, discipline, libel, slander, invasion of privacy, defamation, harassment, humiliation, or 'discrimination' involving or directed at any person;

(2) Verbal, physical, mental or emotional abuse resulting from or arising out of such employment-related practices, policies, procedures, acts, errors or omissions including but not limited to those described in (1) above;

(3) Failure to adopt or comply with adequate workplace or employment policies or procedures;

(4) Failure or refusal to provide employment related equal treatment or opportunities;
. . .

(6) Wrongful failure or refusal to employ, train, or promote a person;

(7) Wrongful denial of training, wrongful deprivation of career opportunity, or breach of employment contract;

(8) Negative evaluations, reassignment or discipline of your current 'employee' or 'volunteer worker', or wrongful refusal to employ;
. . .

---

[4] The Court will refer to an "employment practices wrongful act" as an "EPWA" or "Act."

(10) Negligent hiring or supervision which results in any of the other offenses listed in this definition;

. . .

(14) Violation of any Federal, state or local law (common law or statutory) concerning employment or any employment-related practice, policy or procedure described in (1) above, or if insurance is prohibited by law[.]

ECF No. 16-2, PageID.318-19.

Coverage is also limited by a few conditions. First, it is only available where "prior to the 'policy period', no Insured knew or had reason to know" that the employment practices wrongful act had occurred. *Id.* at PageID.303. Second, coverage is unavailable for "any continuation, change, or resumption" of an EPWA if that EPWA was known to any insured prior to the policy period. Third, an EPWA is deemed to have occurred at the earliest point at which an insured (1) reports all or part of the EPWA to the insurer; (2) receives "written or verbal demand or 'claim' for 'loss'" because of the EPWA; or (3) becomes aware by some other means that the EPWA has occurred. Finally, the entire EPWA "will be considered to have occurred on the date of the first act, error, or omission." *Id.* at PageID.304. Argonaut now moves for summary judgment, arguing that Howlett's allegations are not covered by the policies.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. "[A] mere scintilla of evidence in support of the nonmovant's position is not sufficient to create a genuine issue of material fact." *Towner v. Grand Trunk Western R. Co.*, 57 Fed. App'x. 232, 235 (2003) (citing *Anderson*, 477 U.S. at 251-52). Rather, the non-moving party must present sufficient evidence as to each element of the case such that a trier of fact could reasonably find for the plaintiff. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000).

Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.   ANALYSIS

The policy encompasses two obligations on Argonaut's part: a duty to indemnify, and a duty to defend. First, it requires Argonaut to indemnify the City for any sum in excess of the policy's "retained limit" that the City "becomes legally obligated to pay as damages resulting from an 'employment practices wrongful act'" to which the policy applies. Policies, ECF No. 16-2, PageID.303. Second, it requires Argonaut to defend the City against any suit seeking damages resulting from a covered EPWA. *Id.* at PageID.304. Argonaut's motion seeks a declaration that, although Howlett's allegations may constitute an EPWA, that EPWA falls outside of the policy. Thus, Argonaut says it has no obligation to defend or indemnify the City.

Both sides agree that these are "occurrence" policies rather than "claims-made" policies. Pl's Mot., ECF No. 16, PageID.287; Def's Resp., ECF No. 17, PageID.669; *see also* Policy, ECF No. 16-2, PageID.300. A "claims-made" policy offers coverage for claims made during the policy's lifetime, no matter when the events giving rise to the claim happened. *Stine v. Cont'l Cas. Co.*, 419 Mich. 89, 96-97 (1984). Under "occurrence" policies, by contrast, coverage is only available for events that occur during the policy period, but *claims* need not be brought during the policy period. *Id.*; *see also Reed v. Netherlands Ins. Co.*, 860 F. Supp. 2d 407, 414

(E.D. Mich. 2012). Because these are "occurrence" policies, coverage is not available for any Act that occurred prior to July 1, 2012, the effective date of the first Argonaut policy.[5] ECF No. 16-2, PageID.300.

Argonaut points to the policy provision excluding coverage for an EPWA that is known to any insured before the policy term. Argonaut also notes that an EPWA is deemed to have occurred on the date of the first act or omission and is deemed to have been known at the earliest date that any insured became aware of the EPWA.

In her underlying lawsuit, Howlett alleges a course of conduct that began in 2006, shortly after she was hired. Howlett also points to specific discriminatory acts by the individual defendants, most of which occurred after the relevant 2012 policy date. Argonaut contends that Howlett's mistreatment began—and is deemed to have occurred in its entirety—before the policy's effective date, and was known to some of her coworkers at that time, so coverage is excluded. The Court must interpret the policy to determine whether Argonaut is entitled to the declaration it seeks.

Argonaut and the City agree that Michigan law should apply. *See* Pl's. Mot., ECF No. 16, PageID.286; Def's. Resp., ECF No. 17, PageID.667. In Michigan, insurance policies are subject to the ordinary

---

[5] The policy does not appear to include a specific term excluding coverage for events falling outside the policy term, other than a term identifying it as providing "occurrence coverages." ECF No. 16-2, PageID.300. But in any event, the City concedes that it is an "occurrence" policy and no coverage is available for events that predate the policy term.

construction principles that apply to any contract. *Rory v. Cont'l Ins. Co.*, 473 Mich. 457, 461 (2005). The primary goal of contract construction is to honor the intent of the parties. *Superior Commc'ns v. City of Riverview*, 230 F. Supp. 3d 778, 785-86 (E.D. Mich. 2017) (citing *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (1994)).

Terms are to be interpreted in accordance with their commonly used meaning. *Frankenmuth Mut. Ins. Co. v. Masters*, 460 Mich. 105, 112, (1999); *see also Bowman v. Preferred Risk Mut. Ins. Co.*, 348 Mich. 531, 547 (1957) ("Insurance policies should be read with the meaning which ordinary laymen would give[] their words"). Where a policy is unambiguous, the Court must interpret the policy as written. *Frankenmuth*, 460 Mich. at 111.

But if policy language is subject to more than one reasonable interpretation it is ambiguous, and any ambiguities must be construed in favor of the insured. *Farmers Ins. Exch. v. Kurzmann*, 257 Mich. App. 412, 418 (2003). Finally, the language of insurance policies "should be read as a whole and must be construed to give effect to every word, clause, and phrase." *Michigan Battery Equip., Inc. v. Emcasco Ins. Co.*, 317 Mich. App. 282, 284 (2016) (citation omitted).

### a. Whether Argonaut has a duty to defend the City

Under Michigan law, an insurer's duty to defend its insured is broader than its duty to indemnify. *Allstate Ins. Co. v. Freeman*, 432 Mich. 656, 662 (1989). Though the duty to defend depends on the

allegations in the third party's complaint against the insured, an insurer must "look behind the third party's allegations" to analyze whether coverage is "*possible*." *Protective Nat. Ins. Co. of Omaha v. City of Woodhaven*, 438 Mich. 154, 159 (1991) (emphasis added and citation omitted). If there is any doubt about whether the third party's allegations come within the policy, the doubt must be resolved in the insured's favor. *Id.*

If the allegations in the underlying suit "even arguably" fall within the policy's coverage, the insurer has a duty to defend the insured—no matter if the underlying suit is groundless, frivolous, or meritless. *Detroit Edison Co. v. Michigan Mut. Ins.* Co., 102 Mich. App. 136, 142 (1981). Similarly, so long as one claim in a lawsuit falls within the policy, the insurer is obliged to provide a defense against the entire suit. *Auto Club Grp. Ins. Co. v. Burchell*, 249 Mich. App. 468, 481 (2001). Only if a policy "unambiguously" rules out coverage on each and every claim may an insurer lawfully refuse to defend its insured. *Hamilton Specialty Ins. Co. v. Transition Inv.*, LLC, 818 F. App'x 429, 432 (6th Cir. 2020). Argonaut must bear the burden of showing that "every reasonable jury would find that the underlying claims clearly fall outside the plain meaning of the policy." *Great Am. Fid. Ins. Co. v. Stout Risius Ross, Inc.*, 438 F. Supp. 3d 779, 785 (E.D. Mich. 2020) (Michelson, J.). With those principles in mind, the Court considers whether Argonaut has a duty to defend the City.

    *i.*   *Whether factual questions preclude a determination that coverage is not possible*

Argonaut does not dispute that many of Howlett's allegations fall within the policy period and the policy's definition of an employment practices wrongful act. Nevertheless, Argonaut maintains that Howlett's allegations are all part of the same "occurrence" that began shortly after Howlett's hiring, and are thus all deemed to predate the policy.

Several times in its Response, the City points out that there has been no determination of when Howlett's harassment actually began in the underlying suit, nor that any municipal policy of discrimination or hostile work environment actually existed prior to the policy's effective date. It is possible, the City argues, that the factfinder in that suit could determine that no harassment occurred before 2012 at all, which would moot Argonaut's central argument.

Though the City cites no authority in support, its position is correct. In cases where the availability of insurance coverage has turned on the resolution of a disputed or unresolved factual question, courts applying Michigan law have held that an insurer is under an obligation to defend its insured. Unless and until factual questions are settled in a way that unambiguously excludes coverage, the duty to defend remains in force.

This makes good sense in light of the clearly established principle in Michigan that an insurer must defend its insured if the allegations of

a third party's complaint against that insured "even arguably come within the policy coverage." *Livonia Pub. Sch. v. Selective Ins. Co.*, 443 F. Supp. 3d 815, 844 (E.D. Mich. 2018) (citation omitted). Indeed, the duty to defend persists so long as coverage is "possible." *Id.*

As the City observes, there has been no determination in the underlying suit that Howlett was subject to harassment before July 2012. To be sure, the Court denied the City's summary judgment motion as to three of Howlett's claims. *See generally*, *Howlett v. City of Warren*, 2019 WL 4450984, at *1 (E.D. Mich. Sept. 16, 2019). But the Court made no finding as to whether and when specific acts of harassment actually occurred. Instead, it determined only that Howlett had sufficiently alleged the elements of her claims, and that enough evidence existed to create a genuine issue for trial. Moreover, the Court specifically denied Howlett's own motion for summary judgment, explaining that Howlett's claims could only be resolved by trial. *Id.* at *23-24.

Under Michigan law, an insurer may not refuse to defend its insured against a third-party's claim because of the mere possibility—or even likelihood—that disputed facts will be resolved in a way that excludes the third-party's claim from coverage. *See, e.g.*, *Livonia Pub. Sch.*, 443 F. Supp. 3d at 844 ("[H]owever little evidence has emerged that any incidents took place in that period—or indeed however much evidence has emerged that none did—the duty defend still exists as long as coverage is possible.") (citation and internal marks omitted); *St. Paul*

*Fire & Marine Ins. Co. v. Parzen*, 569 F. Supp. 753, 756 (E.D. Mich. 1983) ("[I]f it is shown at trial that the only acts which establish liability of [insured] occurred prior to [the policy's effective] date [insurer] would have no obligation to pay, but this does not relieve [insurer] at this point.").

Thus, even if the Court were to accept Argonaut's argument that Howlett's allegations collectively amount to a single EPWA, Argonaut would only be relieved of its duty to defend the City if a factual determination is made that the EPWA began before July 2012. Unless such a determination is made, and coverage is no longer possible, Argonaut may not avoid its obligation to defend the City—at least not on the ground that the conduct Howlett complains about may predate the policy.

### ii. *Whether Howlett's allegations amount to multiple occurrences or a single occurrence*

Argonaut's central contention is that Howlett's allegations collectively amount to one single EPWA that began before the policy term, and is therefore excluded from coverage. If, under the unambiguous language of the policy, Howlett's allegations constitute a single EPWA for which no coverage is available, then Argonaut has no duty to defend the City.

Under the policy, an EPWA is covered only if caused by an "occurrence." Policy, ECF No. 16-2, PageID.303. An "occurrence," in turn,

14

is defined as "an event, including continuous or repeated exposure to substantially the same generally harmful conditions." *Id.* at PageID.321. According to Argonaut, the relevant "occurrence" was not each individual harassing act of each employee, but rather the City's alleged customs or policies that caused the harassment overall. The City argues that Howlett was subjected to multiple discrete acts, and that "[e]ach separate allegation of a different type or form of discrimination" must be treated as a separate occurrence. Def's. Resp., ECF No. 17, PageID.680.

Argonaut bases its argument primarily on *Scott Fetzer Co. v. Zurich American Ins. Co.*, a Sixth Circuit decision applying Ohio law. 769 F. App'x 322, 324 (6th Cir. 2019). *Fetzer* involved a dispute between a vacuum manufacturer and its insurer. Three women had sued the manufacturer and one of its contractors, alleging that the contractor had sexually assaulted each of the women on several occasions. *Id.* at 323-25. The insurer argued that each assault was a separate occurrence, and therefore that the manufacturer would have to pay multiple deductibles before any coverage kicked in. *Id.* at 325. The manufacturer sued its insurer, arguing that the entire course of conduct was caused by a single occurrence: the manufacturer's negligent supervision of the contractor. *Id.* The Sixth Circuit held that the word "occurrence" as used in the policy was ambiguous, and that the manufacturer's interpretation was a reasonable one. *Id.* at 326-27.

15

But while *Fetzer* is instructive, it does not control the result here.[6] Critically, the Sixth Circuit did not hold that the manufacturer's preferred interpretation of the contract (the same interpretation Argonaut urges here) was the *only* proper interpretation of the term. Instead, it held that it was a *reasonable* interpretation of the term. Because Ohio law, like Michigan law, requires that all ambiguities be construed in favor of coverage, the manufacturer's interpretation controlled. *Fetzer*, 769 F. App'x at 326; *Grp. Ins. Co. of Michigan v. Czopek*, 440 Mich. 590, 597 (1992) (explaining that under Michigan law, "[p]olicy exclusions are strictly construed against the insurer").

Here, the roles are reversed. Argonaut, the insurer, argues that all of Howlett's claims amount to a single "occurrence" under the policy. The City, the insured, says that there was more than one "occurrence." So, just as in *Fetzer*, if the policy is ambiguous because it is subject to multiple reasonable interpretations, and the City's reading is one such reasonable interpretation, Argonaut must defend the City.

The policy defines an "occurrence" as "an event, including continuous or repeated exposure to substantially the same generally harmful conditions." Policy, ECF No. 16-2, PageID.321. In *Fetzer*, the Sixth Circuit held that near-identical language was ambiguous. *Fetzer*,

---

[6] *Fetzer* also does not control because it applied Ohio, not Michigan law, but it is helpful because the law of both states shares common features with respect to the interpretation of insurance agreements.

769 F. App'x at 326-27. That policy defined an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 325. The Sixth Circuit explained that the language was ambiguous as "there is more than one way to interpret the word 'occurrence.'" *Id.* at 327. So too here.

The question, then, is whether the City's reading of the policy is a reasonable one. Just as in *Fetzer*, it is, and for two reasons. First, courts applying Michigan law and the law of other states have interpreted the word "occurrence" in the manner the City suggests. That is, they have held that a repeated course of sexual assault or similar conduct may give rise to multiple "occurrences" for purposes of an insurance policy, despite the conduct having a single common cause, such as the negligent hiring or supervision of an abusive employee. Second, the language of the policy itself supports this interpretation. The court addresses these reasons in turn.

As another court in this District has explained, "even in cases where insurance policies have defined an "occurrence" as encompassing a series of related acts," courts have generally held that that "ongoing sexual abuse or exposure to harmful conditions that causes discrete injuries in multiple policy periods triggers coverage under each of the policies in effect during this time span." *W. World Ins. Co. v. Lula Belle Stewart Ctr., Inc.*, 473 F. Supp. 2d 776, 782 (E.D. Mich. 2007) (Rosen, J.) (collecting cases).

Courts elsewhere have reached the same result. In *Interstate Fire & Cas. Co. v. Archdiocese of Portland in Oregon*, 35 F.3d 1325, 1329 (9th Cir. 1994), the Ninth Circuit held that repeated sexual abuse of a child by a priest constituted multiple occurrences for purposes of an insurance policy containing similar language, not a single occurrence of negligent hiring or supervision. And in *Roman Cath. Diocese of Joliet, Inc. v. Interstate Fire Ins. Co.* 292 Ill. App. 3d 447, 455 (1997) the Appellate Court of Illinois held that negligent supervision may constitute multiple "occurrences" if an employer receives notice of misconduct but fails to act. *See also Lee v. Interstate Fire & Cas. Co.*, 86 F.3d 101, 104 (7th Cir. 1996); *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 150 F.3d 526, 531-32 (5th Cir. 1998) (collecting cases). There are, however, two non-binding cases not cited by either party that lend Argonaut's position some support: *Mead Reinsurance v. Granite State Ins. Co.*, 873 F.2d 1185 (9th Cir. 1988), and *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56 (3d Cir. 1982).

In *Mead*, a city police department faced twelve lawsuits arising under 42 U.S.C. § 1983: eleven alleging police brutality and one alleging police harassment. The city argued that its conduct amounted to only one "occurrence," while its insurer argued that there had been multiple occurrences—each act of brutality or harassment. *Mead*, 873 F.2d at 1187. Though the injuries in each complaint were different and arose from different police actions, the Ninth Circuit held that there had been

only two occurrences under the insurance policies. One occurrence was the adoption of a municipal policy condoning brutality, the other occurrence the adoption of a policy condoning harassment. This was because liability under § 1983 would arise not from each separate act of police misconduct, but from the "underlying municipal policy of condoning a series of similar police acts." *Id.* at 1188.

In *Appalachian*, an insured employer was sued for allegedly adopting employment policies that discriminated against women in hiring, promotion, and compensation. 676 F.2d at 58. The dispute in that case was whether there was a single occurrence or more than one. The Third Circuit held that, even though each plaintiff suffered injuries of different magnitude over a period of time, all of the various plaintiffs' injuries stemmed from the same cause: the employer's adoption of its discriminatory policies. *Id.* at 61.

But though these cases appear to support Argonaut's position, the distinctions between *Mead*, *Appalachian*, and this case illustrate why the City's "multiple occurrences" reading is indeed a reasonable one. In *Mead*, the Ninth Circuit affirmed the district court's finding that there were two occurrences: one for each of the city's policies. Here, Howlett identifies and alleges no fewer than seven policies or customs: a policy of directing racial harassment, a policy of directing sexual harassment, failure to train officers with respect to race discrimination, failure to train about sex discrimination, failure to address known racial and

19

sexual discrimination, failure to discipline officers for racial and sexual discrimination, and retaliating against individual officers by refusing to provide them backup. *See* Underlying Complaint, ECF No. 16-3, PageID.390. *Mead* shows that multiple related policies, which might have multiple starting and ending dates, can give rise to multiple "occurrences" under a similar policy.

Further, the *Mead* court looked to what act or acts would give rise to liability in the underlying § 1983 suit, and concluded that the city would only be liable if it were found to have adopted a discriminatory custom or policy. But here, liability for the City could arise from the adoption of any one of several discriminatory or retaliatory customs under § 1983 or from employment discrimination, retaliation, or creation of a hostile work environment under Title VII. Even more fatal to Argonaut's position (that there is no *possibility* that even a single claim in the underlying suit could have arisen after 2012), each individual Defendant could only be liable under § 1983 for their individual actions. And at least some of those defendants are only alleged to have discriminated against Howlett after 2012.

*Appalachian* offers a different contrast. There, the underlying lawsuit focused on two identifiable policies that discriminated on the basis of sex: (1) the employer's maternity leave policy; and (2) the creation of two sex-segregated entry-level positions with substantially the same responsibilities but different pay. *Appalachian*, 676 F.2d at 58 n. 4; *see*

*also Wetzel v. Liberty Mut. Ins. Co.*, 372 F. Supp. 1146, 1149, 1150-55 (W.D. Pa. 1974) (explaining the employer's policies). Here, again, Howlett alleges seven discriminatory policies. More important, the discriminatory policies in *Appalachian* were explicit and identifiable: they were written policies adopted on specific dates. By contrast, at the summary judgment stage in the underlying suit, Howlett's arguments did not identify a specific, explicitly adopted policy. Instead, she focused on an inaction theory: that the City had failed to train its officers or adequately respond to known harassment.

Howlett's allegations more closely resemble those discussed by Judge Rosen in *Lula Belle* and the Ninth, Seventh, and Fifth Circuits in *Diocese of Joliet, Lee*, and *H.E. Butt Grocery*, respectively. Those cases all involved a repeated failure by an insured employer to train or supervise its employees rather than an explicit, identified policy as discussed in *Appalachian* or the multiple policies in *Mead*. As noted above, courts have tended to treat failures to train or supervise as giving rise to multiple occurrences, rather than a single ongoing one.

Turning to the language of the policy itself, the policy's definition of "occurrence" can be reasonably interpreted as the City suggests. The policy explains that an "occurrence" is "an event, including continuous or repeated exposure to substantially the same generally harmful conditions." Policy, ECF No. 16-2, PageID.321. There can be no doubt that an individual act of harassment or an individual decision not to

21

punish or re-train a harassing employee is an "event." And, when the Sixth Circuit held in *Fetzer* that "repeated exposure to substantially the same generally harmful conditions" could be read to encompass a single ongoing failure to supervise an employee, it all but stated that the alternate reading—identical to the City's reading here—was *also* a reasonable one. The Sixth Circuit explained that "the most obvious thing" that the three victims "were exposed to was [the harassing employee] himself." *Fetzer*, 769 F. App'x at 327. The *Fetzer* court continued on, explaining that "while . . . it might be semantically awkward to argue that what the women were exposed to was [the insured's] negligent supervision, it is nonetheless the case that [the insured's] burden is not to prove that its reading is the most reasonable one." *Id.* As the Sixth Circuit implied, the City's preferred reading—that Howlett was "exposed to" the harassment itself, or to individual acts of negligent supervision or failure to train each individual employee—is a natural and reasonable reading of the policy language. *See also Lee*, 86 F.3d at 104 (explaining that an abusive employee priest "is not a 'condition' but a sentient being, and of course the victim was never 'exposed' to the Diocese's negligent supervision.").

In any event, it is clear that this language can be interpreted in multiple ways. And Michigan law requires ambiguous language to be interpreted in favor of the insured. Finally, there are significant questions in the underlying litigation yet to be resolved. For example, as

this Court identified in its summary judgment order, the City provided evidence of diversity training sessions offered in 2005, 2006, 2007, and 2009, but none thereafter. *Howlett*, 2019 WL 4450984, at *22. If a policy or custom of condoning racial and sexual harassment indeed existed, it is not at all clear from the current record when it began. Or the evidence might ultimately show that the City received warning about the harassment Howlett experienced but failed to act, giving rise to multiple occurrences of negligent supervision, as in *Diocese of Joliet*. Or a jury might decline to find the City liable for a long-running practice of condoning discrimination that predated the policy while still finding that one or more of the individual defendant police officers—all of whom are "insureds" under the policy—discriminated against Howlett individually based on discrete acts taken while the policy was in force.

The precise number of "occurrences" will need to await later determination should the City be found liable to pay in the underlying suit. At this stage, it is enough to say that Argonaut has not borne its burden of showing that "every reasonable jury would find that the underlying claims clearly fall outside the plain meaning of the policy." *Stout Risius Ross, Inc.*, 438 F. Supp. 3d at 785. Accordingly, Argonaut cannot disclaim its duty to defend on these grounds.

    *iii.    Whether any insured knew of Howlett's alleged harassment*

Argonaut points out that coverage is only available for an EPWA if "prior to the 'policy period', no Insured knew or had reason to know that

the [Act] had occurred." Policy, ECF No. 16-2, PageID.303. Argonaut further argues that the policy unambiguously excludes coverage for the resumption, continuation, or change in any EPWA where any insured knew, or had reason to know, about that Act prior to the policy term. The City responds that the policy's knowledge requirement speaks only to knowledge by the City, the policy's first named insured. Because the policy defines an "employment practices wrongful act" as "any loss or injury" to any person resulting from one of the enumerated acts, *id.* at PageID.318, the relevant knowledge is of Howlett's loss or injury.

This is no basis to grant summary judgment in Plaintiff's favor for several reasons. First, as discussed above, Argonaut has not shown that the policy is unambiguous in its definition of an "occurrence," and that the City's reading of the policy is an unreasonable one. If the policy is read to encompass multiple occurrences, some of those occurrences would necessarily have arisen after the policy's effective date based on the underlying allegations. Consequently, no insured could have known— prior to the policy's effective date—of injuries stemming from occurrences *after* the policy's effective date. Second, a reasonable juror could conclude that neither the City nor anyone in the police department (other than Howlett) knew or should have known about Howlett's injuries prior to 2012.

Argonaut contends that Deputy Police Commissioner Matthew Nichols and Lieutenant Stephen Mills had actual knowledge of Howlett's

injuries at some point before 2012. Argonaut also appears to argue that, as a City employee, Howlett herself was an "Insured," and was, necessarily, aware of her own alleged mistreatment. Finally, Argonaut points to the police department's policy requiring employees to report any harassment to a supervisor, and for supervisors to document those reports, contending that that the City should have known of the alleged harassment because of that policy. These arguments do not persuade.

First, Mills did not meet Howlett until at least 2015. Mills Dep., ECF No. 16-8, PageID.608. So whatever Mills knew is irrelevant to the critical pre-2012 time period. Second, as to Argonaut's argument that an "insured" had knowledge of Howlett's claim because Howlett *herself* knew about her own alleged harassment, the City responds that, under the policy, employees are only "insureds" for acts within the course and scope of their employment. Argonaut ignores this requirement, and does not explain how Howlett's having knowledge of her own harassment would fall within the scope of her job duties.

More critically, as the City points out, Argonaut's reading would write out the knowledge requirement entirely in all cases involving employees: from the moment the employee suffered or inflicted an injury, knowledge would attach, as all employees are defined as "insureds" for purpose of the policy. The Court must avoid an interpretation that does not give meaning to every term in an insurance policy. *Royce v. Citizens Ins. Co.*, 219 Mich. App. 537, 542 (1996). Argonaut does not respond to

these arguments or defend its position that Howlett's knowledge of the harassment is relevant to this motion. Accordingly, Howlett's knowledge is no basis to grant summary judgment to Argonaut.

As for Argonaut's point that department policy required employees to report harassment, and for supervisors to document such reports, Howlett herself acknowledged that she made no complaint about racial or sexual harassment before 2012. Howlett Dep., ECF No. 16-5, PageID.487-89. She made one complaint some time in 2010 or 2011 about a police dispatcher, but when interviewed about that complaint, Howlett specifically denied that the incident had anything to do with her race or sex. *Id.* at PageID.526. Accordingly, a reasonable juror could conclude that, notwithstanding the police department's sexual harassment reporting policies, the City did not know and should not necessarily have known of Howlett's alleged harassment.

Argonaut's best argument is that Deputy Commissioner Nichols knew of Howlett's EPWA-related injury. Nichols knew Howlett throughout much of her employment with the police department. Nichols Dep., ECF No. 16-7, PageID.552-53. But he testified that, although Howlett had complained to him about some of her coworkers at the police department in a general way, she never told him that she had been harassed on the basis of race, and she had specifically and repeatedly declined to file any complaint. *Id.* at PageID.580, 582. Nichols recalled a specific incident in 2015 or 2016 about which Howlett made a definite

26

complaint of racial and sexual harassment, but Nichols' knowledge of that complaint is irrelevant to the pre-2012 period. *Id.* at PageID.582. He further testified that in his conversations with Howlett prior to that 2015 or 2016 incident, he had been a "confidant," "venting post" and "friend," but that nothing she said had "ever r[isen] to the level of a complaint" about conduct that would have "affected her work environment." *Id.* Nichols testified that nothing about which Howlett complained was ever "represented to [Nichols as] intimidating, threatening, harassing or hostile." *Id.*

To be sure, whether or not Nichols knew before 2012 that Howlett has suffered a "loss or injury" resulting from one of the enumerated acts set forth in the policy is a close question. But ultimately, with respect to the pre-2012 period, Nichols admitted only a general awareness of nonspecific complaints from Howlett about her working conditions in the police department. He denied knowing about pervasive or serious racial or sexual harassment, and did not testify about any specific complaints by Howlett before 2012. And, critically, Howlett herself admitted that she never complained to supervisors about racial or sexual harassment before 2012.

All in all, this may be enough to show knowledge on Nichols' part. But at this stage, Argonaut has not borne its burden of showing that no reasonable juror could conclude otherwise. Argonaut has not shown that every reasonable juror would find that Nichols was aware of a "loss" by

or "injury" to Howlett caused by one of the acts encompassed in the policy's definition of an EPWA.

### b. Whether Argonaut has a duty to indemnify the City

In its Complaint and this Motion, Argonaut also seeks a declaration that it has no obligation to indemnify the City should the City become liable to Howlett. Neither party expressly discusses this requested relief in its papers.

A court may not consider unripe claims—those that are "anchored in future events that may not occur as anticipated, or at all." *Jackson v. City of Cleveland*, 925 F.3d 793, 807 (6th Cir. 2019) (citation omitted). The ripeness inquiry considers whether the issues are appropriate for resolution and takes into account the "hardship to the parties" if the Court declines to adjudicate the dispute because it is not yet ripe. *Id.*

With those considerations in mind, the Sixth Circuit has explained that, "as a general matter, a claim for indemnification for damages that may be awarded on an underlying tort claim should not be adjudicated on the merits until the underlying claim is adjudicated." *Id.* at 807-08 (collecting cases). Following *Jackson*, courts in this district have declined to consider an insurer's indemnification arguments before the underlying claim is resolved. *See, e.g.*, *Livonia Pub. Sch.*, 2020 WL 728540, at *9 (duty to indemnify "exists only when the third-party's allegations have been proven true or when, after factual development, the insurer and insured decide settle the claims rather than test their veracity in court");

28

*Stout Risius Ross, Inc.*, 438 F. Supp. 3d at 789 (declining to consider as unripe insurer's request for a declaration on duty to indemnify while underlying litigation was still pending); *Aspen Specialty Ins. Co. v. Proselect Ins. Co.*, 2021 WL 5919062 at *7 (E.D. Mich. Dec. 15, 2021) (same).

The policy provides that Argonaut must pay sums that the City "becomes legally obligated to pay." Policy, ECF No. 16-2, PageID.303. The City has not yet become legally obligated to pay anything. And indeed the underlying suit could possibly result in no damages, which would moot the indemnification issue altogether. In short, no prejudice would result to either party should the Court defer a ruling on the indemnification issue because the City has not yet incurred any liability to Howlett. Accordingly, the Court will deny without prejudice Argonaut's motion on the duty-to-indemnify issue.

## IV.   CONCLUSION

Because Argonaut has failed to meet its burden to establish as a matter of law that it has no duty to defend the City in Howlett's lawsuit, Argonaut's Motion for Summary Judgment (ECF No. 16) is **DENIED**. Because the issue of indemnification is not ripe, the Court **DISMISSES WITHOUT PREJUDICE** Argonaut's request for a declaratory judgment on the issue of whether it has a duty to indemnify the City for Howlett's claims.

**IT IS SO ORDERED.**

DATED: March 22, 2023

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge